UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ALPHA RECYCLYING, INC.,                                     :
                                    Plaintiff,              :
                                                            :           14-CV-5015 (JPO)
                    -v-                                     :
                                                            :           OPINION AND ORDER
TIMOTHY CROSBY, d/b/a CONVERTER                             :
GUYS, d/b/a CONVERTERGUYS.COM, d/b/a                        :
RECYCLING ALPHA,                                            :
                                    Defendant.              :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

Plaintiff Alpha Recycling, Inc. moves for summary judgment on its claims for cybersquatting and defamation against defendant Timothy Crosby. (Dkt. No. 51.) For the reasons that follow, Plaintiff's motion is granted in part and denied in part.

I.   Background

Alpha Recycling, Inc. ("Alpha") is a New York corporation that recycles catalytic converters and scrap metal.[1] (Dkt. No. 54 ¶ 2.) In connection with its recycling business, Alpha uses the unregistered "ALPHA" mark ("the Mark"). (Id. ¶¶ 16-18.) In July 2010, Alpha registered the "AlphaRecyclingUS.com" domain name, which it uses to market and promote its services. (Dkt. No. 59 ¶¶ 7, 8.)

Defendant Timothy Crosby is a precious metal broker who trades in catalytic converters. (Dkt. No. 55-3 at 7:20-8:5.) He operates his business under the names "Converter Guys" and "Converter Guy." (*Id.* at 12:5-13:6.) Crosby owns and receives business through two associated websites, "Converterguys.com" and "Converterguy.com." (*Id.* at 13:3-14:3.)

---

[1] To the extent possible, and unless otherwise noted, the Court relies on facts that are undisputed by the parties. (Dkt. Nos. 53, 59.)

The parties started doing business together in November 2011, when Crosby began to sell catalytic converters to Alpha in bulk. (Dkt. No. 59 ¶¶ 9-10.) Over the course of a year, Crosby sold approximately two million dollars' worth of catalytic converters to Alpha. (*Id.* ¶ 11.) The parties agree that Crosby was paid according to a "price list" that was provided to Crosby in advance and that Crosby was never forced to sell to Alpha. (*Id.* ¶¶ 12-18.)

Alpha states that "[d]uring the entire time that the parties did business together, Defendant never complained to Alpha about any of its prices, or claimed that Alpha's buyer was mismarking the pad, or otherwise lying, cheating or stealing from him." (*Id.* ¶ 19.) Crosby states that he did not complain to Alpha directly, but instead to Alpha's buyer Mario Martula. (*Id.*)

Just a few months after the business relationship between the parties started, Crosby began registering domain names that used the term "alpha" in relation to recycling services. (Dkt. No. 59 ¶ 22.) In November 2011, Crosby registered "AlphaRecycling-US.com"; in February 2012 he registered "AlphaConverters.net"; and in January, 2013 he registered the "AlphaRecyclingUS.net" domain name. (*Id.* ¶¶ 23-25.) Crosby stated that his reason for purchasing these domain names was "to sit on them." (*Id.* ¶ 26.) Crosby does not dispute that visitors to "AlphaRecyclingUS.net" were redirected to "Converterguys.com." (*Id.* ¶ 27; Dkt. No. 55-3 at 29:3-30:3.) Crosby testified that he redirected traffic in order to "get back at [Alpha]" because "they had taken away a very large portion of [his] business . . . ." (Dkt. No. 55-3 at 29:3-29:18; Dkt. No. 59 ¶ 28.) He also posted a video to YouTube with the title "Alpha Catalytic Converter Recycling Experts." (Dkt. No. 59 ¶ 30.) When a user clicked on the video, a commercial for Crosby business The Converter Guys was displayed. (*Id.* ¶ 31.)

In September 2013, Alpha's David Zenko sent Crosby a text message that read "Mario told me that you called him to get prices for rims and batteries. You talk to[o] much bullshit

2

about Alpha all over [such as] that we are going out of business, that was lose money[,] etc. . . . It's all bullshit . . . . Please don't call us because we don't want to do business with you!!!" (Dkt. No. 55-5.) Crosby responded, "Sorry for the confusion, I thought we were on good terms . . . . Everyone talks shit in [t]his industry and [you] can't believe everything [you] hear . . . ." (*Id.*)

On or about December 2013, Crosby posted a "one star" rating for Alpha on Google, writing "Do not do business with these scumbags[,] they ripped me off . . . they act like they are marking my converter and they don't. [T]hese scumbags rip people off all the time . . . sellers beware." (Dkt. No. 59 ¶ 29.)

On or about April 26, 2014, Crosby posted a review of Alpha on the website "RipoffReport.com." (*Id.* ¶ 34.) Crosby charged that Alpha is "ripping off people all the time" including by "ripping off scrapyards, towing companies and repair shops" and that Alpha is a "thief." (*Id.* ¶ 35.) Specifically, Crosby wrote that Alpha has a practice of advertising "higher prices than anyone" in order "lure" in customers. (Dkt. No. 45-10 at 1.) He wrote that Alpha "cheat[s] on the pad by not marking or mis marking [sic] the pad" and "do[es] not grade the converters properly so that they can use . . . unrealistic numbers." (*Id.*) Crosby explained that "[o]nce the seller catches on then the relationship is over and then [Alpha] go[es] after the area that the seller is in with even higher prices." (*Id.*) "All you have to do is ask your local catalytic converter recycler on the east coast and they will be able to explain to you how they lie, rob, cheat and essentially steal your precious metals." (*Id.*) Crosby further stated that "[t]he buyer I worked with actually told me about this process and at the end of our relationship admitted that he had done it to me too!" (*Id.* at 1-2.) Crosby asked readers to reach out and contact him if they did not believe the report, and suggested that "[he] can give [interested parties] a reference to contact locally that will back up and agree" with his account of Alpha's business practices. (*Id.*)

It is undisputed that Crosby "ha[d] not spoken to any third parties about Alpha's alleged business practices at the time he made" this report and that he "knew of not a single scrap yard to corroborate his allegations." (Dkt. No. 59 ¶ 44.)

Alpha filed the operative Complaint in this matter on April 13, 2015, asserting claims against Crosby for cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as well as common law claims for defamation and trade libel, unfair competition, and trademark infringement. (Dkt. No 38.) On June 1, 2015, Alpha moved for summary judgment on its cybersquatting and defamation claims. (Dkt. No. 51.) Crosby filed his opposition on June 25, 2015.[2] (Dkt. No. 60.) Plaintiff filed a reply in support of its motion on July 10, 2015. (Dkt. No. 66.)

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

---

[2] Crosby moves to strike the Declaration of Iga Wolotowski pursuant to Federal Rule of Civil Procedure 37(c)(1), which provides that a party that "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Crosby argues the declaration contains heretofore undisclosed information about damages suffered by Alpha and that Alpha "has no explanation or defense for its failure to produce highly relevant information regarding its alleged damages" prior to its submission. (Dkt. No. 60 at 13-16.) Because the Court does not rely on any of the Wolotowski declaration's averments on the subject of damages, Crosby's request to strike is denied as moot.

### III. Cybersquatting

The ACPA protects consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders." *Sporty's Farm L.L.C. v. Sporstman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000); *see* 15 U.S.C. § 1125(d). "To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011); *see* 15 U.S.C. § 1125(d)(1)(A). Crosby opposes summary judgment on two grounds: (1) that the Mark was not protectable and distinctive and (2) that Crosby did not have the requisite bad faith.

#### A. Distinctiveness

To prevail on its claim, Alpha must first demonstrate that the Mark is "distinctive or famous and thus entitled to the ACPA's protection."[3] *Sporty's*, 202 F.3d at 497. *See Diesel S.P.A. v. Does*, No. 14-CV-4592, 2016 WL 96171, at *6 (S.D.N.Y. Jan. 8, 2016); *New World Solutions, Inc. v. NameMedia Inc.*, No. 11-CV-2763, 2015 WL 8958390, at *20 (S.D.N.Y. Dec. 15, 2015). As a rule, a registered trademark is presumed to be distinctive. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008). An unregistered mark, such as the Mark in this case, is entitled to protection "if it would qualify for registration." *Courtenay Commc'n Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003). Thus, Alpha must

---

[3] Because Alpha does not argue that the Mark is famous, the Court need not examine whether it is entitled to protection on that ground.

demonstrate that its mark is sufficiently "distinctive" to meet the requirements for registration. *Id.*

A mark may be distinctive in one of two ways: "either because it is 'inherently distinctive'—i.e., its intrinsic nature serves to identify its particular source—or because it has acquired a 'secondary meaning' in the minds of consumers." *Artisan*, 559 F. Supp. 2d at 449 (quoting *Star. Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 381 (2d Cir. 2005)). In assessing distinctiveness, courts first determine whether the trademark at issue is (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or fanciful. *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 415 (S.D.N.Y. 2012). Under this "now-classic test originally formulated by Judge Friendly . . . word marks that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent) are held to be inherently distinctive" and therefore protectable. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-211 (2000) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976)). Alternatively, a "descriptive" mark, although "it is not inherently distinctive," may acquire distinctiveness "if it has developed *secondary meaning*, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart*, 529 U.S. at 211 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)) (emphasis added). Generic marks, in contrast, are never protectable. *Artisan*, 559 F. Supp. 2d at 449.

"[T]he initial classification of a mark to determine its eligibility for protection is a question of fact left to the determination of the district court." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-40 (2d Cir. 1992). As such, this issue "may be decided on summary judgment as a matter of law where there is no genuine issue of material fact for trial as to the issue." *Cross Commerce Media, Inc. v. Collective, Inc.*, No. 13-CV-2754, 2014

WL 1202939, at *5 (S.D.N.Y. Mar. 24, 2014) (citing *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 314 (S.D.N.Y. 2012)); *see also Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1340 (2d Cir. 1992); *Fagnelli Plumbing Co. v. Gillece Plumbing and Heating, Inc.,* No. 10-CV-679, 2011 WL 693349, at *3-4 (W.D. Pa. Feb. 15, 2011) (summary judgment in favor of plaintiff on ACPA claim concerning unregistered mark).

Alpha contends that the Mark—"ALPHA"—when used in connection with Alpha's goods and services, is arbitrary and therefore inherently distinctive and entitled to trademark protection. (Dkt. No. 52 at 17.) Arbitrary, in this context, means that a word with an ordinary meaning "is applied to . . . goods in a totally arbitrary and nondescriptive sense . . . . By the very nature of the term 'arbitrary' it is assumed that the word used as a mark is in use in the language, but has no descriptive connotation with this product." 2 McCarthy on *Trademarks and Unfair Competition* § 11:11 (4th ed. 2016). For example, "'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." *Abercrombie*, 537 F.2d at 9 n.6. Put another way, "[a]rbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Star*, 412 F.3d at 385.

The parties agree that "alpha" is a common word in the English language. Alpha submits that, in common usage, alpha can mean: (1) "the first letter of the Greek alphabet," (2) "something that is first," (3) "having the most power in a group of animals or people . . . [i.e.] an *alpha* male." (Dkt. No. 46 ¶ 15 (citing the Merriam-Webster Dictionary, *Alpha*, www.merriam-webster.com/dictionary/alpha).) In turn, Alpha contends that when the term "ALPHA" is used in connection with scrap metal recycling services it is arbitrary, as there is no relationship between the dictionary definitions of the term and scrap metal services.

The Court agrees with Alpha that the Mark, when used in relation to catalytic converter recycling, is arbitrary and therefore inherently distinctive, and that there is no genuine issue of material fact as to this issue. *See Rockland*, 894 F. Supp. 2d. at 314. The dictionary definitions of "alpha" do not "communicate any information about [the recycling of catalytic converters] either directly or by suggestion." *Star*, 412 F.3d at 385; *see Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 123 (D. Conn. 2002) ("The Court has no doubt that the marks "omega" and "O," as used in connection with the manufacture and sale of watches, clocks, and electronic timing equipment, are inherently distinctive. The meanings associated with the word "omega" and letter "O" do not suggest time or watches.")

Crosby, on the other hand, contends that the word "alpha" is commonly used as a "laudatory" adjective, because it can be used to mean "the most dominant, powerful, or assertive person in a particular group." (Dkt. No. 60 at 17 (citing Dictionary.com, *Alpha*, www.dictionary.reference/com/browse/alpha?s=t (last visited March 4, 2016)). Because it is laudatory, Crosby argues, the Mark is merely *descriptive*, not inherently distinctive, and thus can only be distinctive if it has acquired secondary meaning in the minds of the public. *Wal-Mart*, 529 U.S. at 211.

This argument fails for two reasons. First, although "alpha" can be used to refer to the most powerful person or animal in a group (like alpha male or alpha dog), Defendant submits no evidence suggesting that "alpha" is used in relation to things (such as catalytic converters) or services (such as recycling). The term "alpha dog" has ordinary meaning, but "alpha stapler" is nonsense. Therefore, even if alpha can be used in a laudatory sense, it is not used in a laudatory sense when the subject is scrap metal recycling. The only question before the Court is whether the Mark is distinctive when used in connection with Alpha's business. If Alpha were operating a kennel, the result may well be different.

Second, even if the term "alpha" is laudatory in this context, the Second Circuit has stated that a "term that is merely self-laudatory, such as 'plus' or 'super,' seeking to convey the impression that product is excellent or of especially high quality, is generally deemed *suggestive*." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997) (emphasis added) (citing *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir. 1983)); *see also In re Ralston Purina Co.*, 191 U.S.P.Q. 237, 238 (T.T.A.B. 1976)). And because a suggestive mark is, like an arbitrary or fanciful mark, deemed inherently distinctive, categorizing "alpha" as laudatory would not alter the Court's conclusion that the Mark is protectable.[4]

To be sure, there is also authority stating that laudatory terms should generally be considered *descriptive*. *See Murphy v. Provident Mut. Life. Ins. Co. of Philadelphia*, 923 F.2d 923, 927 (2d Cir. 1990) ("Marks that are laudatory and that describe the alleged qualities or characteristics of a product or service are descriptive marks."); *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 371-372 (S.D.N.Y. 2003) ("[S]elf-laudatory terms such as 'Original' and 'Famous' are usually not entitled to protection."). But the conceptual difference between suggestive and descriptive marks, albeit hazy, reinforces the Court's conclusion that "alpha" is on the suggestive side of the line even if it is laudatory. "Descriptive marks are those consisting of words identifying qualities of the product." *Star*, 412 F. 3d at 385. Suggestive marks, in contrast, "are those that are not directly descriptive, but do suggest a quality or qualities of the product through the use of imagination, thought, and perception." *Id.* (citation

---

[4] Crosby does not argue that the Mark is laudatory on the basis that the term "alpha" can mean "first." (Dkt. No. 46 ¶ 15 (citing the Merriam-Webster Dictionary, *Alpha*, www.merriam-webster.com/dictionary/alpha).) Even if Crosby had raised such an argument, the Court would likely reach the same conclusion. *See First Jewellery Co. of Canada, Inc., v. Internet Shopping Network LL*, No. 99-CV-11239, 2000 WL 122175, at *4 (S.D.N.Y. Feb. 1. 2000) ("FIRST is a laudatory, descriptive term referring to the products' 'First Quality' . . . The Court finds that FIRST JEWELLERY is a *suggestive* mark . . . .").

and internal quotation marks omitted).  The Court concludes that a person confronted with the Mark will grasp the laudatory nature of the term only after considerable use of "imagination, thought, and perception."  Given Crosby's failure to submit any evidence that "alpha" can be used to describe a thing or service, the Court cannot conclude that an observer will directly infer from the Mark some characteristic of Alpha's recycling services without first reasoning by analogy to "the most dominant, powerful, or assertive person in a particular group"—the definition highlighted by Crosby.[5]

Crosby's remaining arguments are based on Alpha's purported failure to show that the Mark has acquired secondary meaning.  But given that the Court concludes the Mark is arbitrary, or at the very least suggestive, Alpha need not demonstrate secondary meaning.  *Wal-Mart*, 529 U.S. 205 at 210-211; *Star*, 412 F.3d at 385.  As there is no genuine issue of material fact as to

---

[5] Alpha also notes that the United States Patent and Trademark Office ("PTO") has registered other marks containing the term alpha, which should reinforce the Court's conclusion that the Mark is inherently distinctive.  (*See* Dkt. No. 55 ¶ 16; Dkt. No. 55-14.)  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009) ("[T]he PTO's registration of [a similar mark] is evidence of the [unregistered mark's] distinctiveness, given the strong similarity between the appearance and purposes of the [two marks].  Deference to the PTO's classification is sensible because the PTO has special expertise that we lack on this fact-intensive issue."); *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 119-120 (1st Cir. 2006).  Crosby, for his part, argues that there are other businesses in the United States—including some recycling businesses—that use the term alpha, such that Alpha's Mark cannot be distinctive.  However, Crosby has not produced an example of another firm's use of the term alpha in connection with catalytic converter recycling.  More importantly, the ACPA requires Alpha to show that its mark is "distinctive."  15 U.S.C. § 1125(d)(1)(a)(ii)(I).  The existence of other firms' using a similar mark does not change whether an inherently distinctive mark is properly classified as distinctive so much as it affects the relative *strength* of the mark.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("Even an inherently distinctive mark can, in its commercial context, lack strength as a mark.").  *Cf.* 2 McCarthy § 11:2 ("[A] word may indeed be fanciful and hence inherently distinctive, yet have little customer recognition or 'strength' in the market . . . ."); *id.* § 11:14 ("[A]rbitrary marks are not necessarily 'strong' marks.  A given arbitrary mark may not suggest or describe anything as to the product, but it also may be in very common use as a mark in this or other product fields, and thus be 'weak.'").  Under the ACPA, the strength of a mark is properly considered as one factor in the bad-faith analysis.  *See* 15 U.S.C. §1125(d)(1)(B)(i).

whether the Mark is distinctive and therefore entitled to ACPA protection, *Sporty's*, 202 F.3d at 497, Alpha's motion for summary judgment on this issue is granted.

### B.     Identical or Confusingly Similar Domain Names

Alpha must next demonstrate that "the infringing domain names complained of are identical to or confusingly similar to [P]laintiff's mark." *Webadviso*, 448 F. App'x at 97. *See* 15 U.S.C. § 1125(d)(1)(A). Alpha has registered the domain name AlphaRecyclingUS.com. (Dkt. No. 59 ¶ 7.) Crosby, in turn, registered "AlphaRecycling-US.com" (which adds a hyphen to Alpha's domain), "AlphaConverters.net," and "AlphaRecyclingUS.net." (*Id.* ¶¶ 22-26.) The domain names at issue are, without doubt, confusingly similar to the Mark and Crosby does not raise any argument against this conclusion. *See Webadviso*, 448 F. App'x 95 (affirming conclusion that "bofaml.com," "mlbofa.com," were confusingly similar to Bank of America's "B OF A" trademark). Accordingly, Alpha's motion for summary judgment on this issue is granted.

### C.     Bad Faith Intent to Profit

Finally, Alpha must demonstrate that Crosby, in registering the domain names at issue, had "a bad faith intent to profit from [the] [M]ark." *Webadviso*, 448 F. App'x at 97. *See* 15 U.S.C. § 1125(d)(1)(A). The ACPA provides nine illustrative factors for courts to consider in determining whether a person has the bad faith required to impose civil liability:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

>(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
>(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
>(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
>(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
>(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

Within these factors, "courts have identified two 'quintessential example[s]' of bad faith: where a defendant 'purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price,' and where a defendant 'intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's.'" *Giaconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 434 (S.D.N.Y. 2013) (Oetken, J.) (citing *Utah Lighthouse Ministry v. Found for Apologetic Info. & Research*, 527 F.3d 1045, 1048 (10th Cir. 2008)).

Because Crosby does not dispute that he diverted users who visited "AlphaRecyclingUS.net" to his own "Converter Guys" website, this case is a "quintessential example" of bad faith within the meaning of the ACPA. *See Webadviso*, 448 Fed. App'x at 98. (Dkt. No. 59 ¶ 27; Dkt. No. 55-3 at 29:3-20:21.) Consideration of the relevant statutory factors underscores this conclusion. For instance, Crosby never used these domain names "in connection with the bona fide offering of any goods or services." 15 U.S.C. § 1125(d)(1)(B)(i)(III). Nor does Crosby contend that he owns a trademark or other intellectual property right in the domain name. 15 U.S.C. § 1125(d)(1)(B)(i)(II).

Crosby appears to argue that he did not have the requisite bad intent to profit because he did not offer to *sell* the domain names to Alpha. (Dkt. No. 60 at 21-22.) Rather, Crosby testified that he bought the domains to "sit on them." (Dkt. No. 55-3 at 27:4-27:19.) He also stated that he redirected traffic from one of the domain names to "Coverterguys.com" because Alpha "had taken away a very large portion of [Crosby's] business and it was the only way [he] thought to get back at them." (*Id.* at 29:3-29:21.) Moreover, it is undisputed that Crosby posted a YouTube video with the title "Alpha Catalytic Converter Recycling Experts" that was in fact a commercial for "The Converter Guys." (Dkt. No. 59 ¶¶ 30-31.) Finally, Alpha has submitted evidence to show that Crosby is a repeat cybersquatter who has registered domain names incorporating the marks of other firms. (Dkt. No. 55 ¶¶ 17-26.)

Together, this evidence leaves little doubt that Crosby had the bad faith intent required under the ACPA. As explained above, "diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's'" is a "quintessential example" of bad faith. *Giaconda Law Grp.*, 941 F. Supp. 2d at 434. Crosby's self-serving testimony—which amounts to a claim that he was motivated by malice, but not profit—is insufficient to create a

genuine issue of material fact as to bad-faith intent and is not credible in light of his broader pattern of engaging in cybersquatting activity and his effort to disguise an advertisement for his own business by using Alpha's Mark on YouTube.  *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).  For these reasons, Alpha's motion for summary judgment on its cybersquatting claims is granted.

### IV.   Defamation

Alpha also moves for summary judgment on its claim for defamation.  "In New York, a plaintiff must establish five elements to recover in libel: (1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability."  *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014).  Crosby's opposition to the motion for summary judgment is silent on the subject of Alpha's defamation claim.  (*See* Dkt. No. 60.)  However, in his Response to Alpha's Rule 56.1 Statement of Undisputed Facts, Crosby states in multiple places that his "defense" to allegations of defamation is that the statements in question were "true."  (*See, e.g.,* Dkt. No. 59 ¶¶ 35-37, 44.)  Because there is a genuine issue of material fact as to the falsity of the allegedly defamatory statements that is sufficient to defeat Alpha's motion for summary judgment, the Court need not address the other elements of the defamation claim.

Under New York law, "it is fundamental that truth is an absolute, unqualified defense to a civil defamation action."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) (Oetken, J.) (quoting *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986)).  "Substantial truth" is sufficient to defeat a charge of libel.  *Guccione*, 800 F.2d at 301.  "A statement is substantially true if the statement would not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (quoting *Fleckenstein v. Friedman*, 193 N.E. 537,

538 (N.Y. 1934)); *see also id.* ("Thus, under New York law, 'it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true.'") (quoting *Printers II, Inc. v. Prof'l Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986)).

It is undisputed that Crosby posted the allegedly defamatory statements on RipoffReport.com. (Dkt. No. 59 ¶¶ 34-37.) In substance, the statements suggest that Alpha cheats its business partners, including by "lur[ing]" in customers with high prices and then, through deceptive tactics, underpaying them. (Dkt. No. 45-10.) The statement also suggests that Crosby had knowledge of other businesses that had worked with Plaintiff and fallen prey to its predatory behavior. (*Id.*)

Alpha argues that these statements are false, because Crosby testified that he had no knowledge of Alpha's dealings with other customers at the time he made them. (Dkt. No. 66 at 23-24.) Moreover, according to Alpha, "[Crosby's] own experience with [Alpha] . . . [including] never complaining on more than 60 transactions over the course of over a year" and Crosby's claim to have "parted with Alpha 'on good terms'" also "belie [Crosby's] claim that [Alpha] was lying, cheating and stealing from him." (*Id.* at 24.)

The critical question, however, is not whether Crosby falsely claimed he had spoken to third parties, but whether Crosby falsely accused Alpha of unethical business practices. Crosby's stated defense to the defamation claim is that Alpha actually engaged in specific, unethical practices. Indeed, Crosby testified that he ended his business relationship with Alpha because he caught an employee of Alpha miscounting goods. (Dkt. No. 55-3 at 62:5-63:11.) Moreover, Crosby has testified that one of Alpha's employees admitted to the firm's practices, and his RipoffReport.com statement made the same allegation. (Dkt. No. 59 ¶ 40; Dkt. No. 55-10.) This testimony raises a genuine issue of material fact as to the falsity of the allegedly

defamatory statements. Accordingly, Plaintiff's motion for summary judgment on its defamation claim is denied.

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment on liability is granted in favor of Plaintiff on its claim for cybersquatting. Summary judgment is denied on Plaintiff's claim for defamation.

The parties are directed to appear for a scheduling conference on April 1, 2016, at 3:00 p.m. in Courtroom 706 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is directed to close the motion at docket number 51.


SO ORDERED.


Dated: March 23, 2016
       New York, New York

_____
J. PAUL OETKEN
United States District Judge